UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**ELECTRONICALLY FILED**

UNITED STATES OF AMERICA                                       PLAINTIFF

v.                        CRIMINAL ACTION NO. 3:14-CR-00108-JHM

HOWARD KEY CHAMBERS                                            DEFENDANT

### DEFENDANT HOWARD KEY CHAMBERS' SENTENCING MEMORANDUM

Howard Key Chambers sexually molested a young girl in 2013 and 2014. He has pleaded guilty under terms requiring him to go to prison for at least fifteen years, and possibly as long as thirty years. (R. 105, Plea Agreement at pg. 5 ¶ 10, Page ID # 512.) The Sentencing Guidelines recommend a period of incarceration at the top of that span. (R. 113, PSR at pg. 12 ¶¶ 71-72, Page ID # 557.)

Mr. Chambers is a 64-year-old man. A reliable psychiatric risk-appraisal test signals only a low probability that he would ever repeat his offense. With every year behind bars, that already-small likelihood of recidivism falls closer to zero, while the costs of confining him in prison rise ever higher.

Thus the question 18 U.S.C. § 3553(a) puts to the Court can be distilled to this: will fifteen years in prison be enough for Howard Key Chambers' punishment to satisfy the goals of incapacitation, rehabilitation, deterrence, and retribution? and if not, how many months must be added to those fifteen years before the prison term becomes "sufficient, but not greater than necessary, to comply" with those four purposes?

1.      Incapacitation

Society has "grave concerns," observed the Supreme Court, about "the high rate of recidivism among convicted sex offenders and their dangerousness as a class...." *Smith v. Doe*, 538 U.S. 84, 103 (2003).  Those concerns place corresponding emphasis on the sentencing goal of incapacitation: the sex offender's threat to harm another child is effectively eliminated by keeping him in prison.

But there comes a point where lengthening an offender's punishment yields a sentence that is longer than necessary to protect the public.  "[R]ecidivism rates decline relatively consistently as age increases...." *United States v. Payton*, 754 F.3d 375, 378 (6th Cir. 2014) (quoting U.S. Sentencing Comm'n, *Measuring Recidivism* at 12 (2004)).  A 2012 study found "overwhelming evidence that prisoners age 50 and older are far less likely to return to prison for new crimes than their younger cohorts," and this low probability "holds true regardless of why

they originally went to prison." Amer. Civil Liberties Union, *At America's Expense: The Mass Incarceration of the Elderly* at 25 (June 2012).[1] According to a recent investigation by the Department of Justice's Inspector General, the few elderly persons who do commit new crimes after release from prison are typically either drug offenders or convicts who were already recidivists before they reached old age. Dep't of Justice Off. of Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* at 37-40 (May 2015).[2] Not surprisingly, a summary of the current research remarked that "length of time served has no clear relationship to recidivism rates – rather, it is *age* that serves as an accurate predictor of recivimism." Osborne Ass'n, *The High Costs of Low Risk: The Crisis of America's Aging Prison Population* (July 2014) (emphasis in original, footnote omitted).[3] The Sixth Circuit's own review of the literature caused it to highlight "the key argument that elderly offenders pose so low a risk to the public that long or otherwise harsh sentences have little to no utilitarian benefit." *Payton,* 754 F.3d at 379 (quoting Dawn Miller, *Sentencing*

---

[1]    Available online at https://www.aclu.org/files/assets/elderlyprisonreport_20120613_1.pdf.

[2]    https://oig.justice.gov/reports/2015/e1505.pdf.

[3]    http://www.osborneny.org/images/uploads/printMedia/Osborne_Aging_WhitePaper.pdf.

*Elderly Criminal Offenders*, 7 Nat'l Acad. Elder L. Att'ys J. 221, 232 (2011)) (punctuation omitted).

Mr. Chambers will be almost eighty by the time he has served the fifteen year minimum sentence for his crime. By then, old age alone will have gone far toward eliminating any risk that he poses to the community's safety, particularly the safety of children. But old age is only one of the factors that predict Mr. Chambers will make a crime-free return to society.

An especially meaningful indicator of Mr. Chambers' probable harmlessness in the future is the finding of "low risk" yielded by the Sex Offender Risk Appraisal Guide (SORAG), an actuarial instrument recently applied by forensic psychologist Wayne G. Herner. (*See* Attach. 1, Herner Rept. at pg. 6.) Experts have found that the SORAG test provides a considerably accurate measurement – perhaps the most accurate measurement available – of the threat that a sex offender will engage in an act of "violent sexual recidivism" (such as a crime involving physical contact with a victim). (*Id.* at pg. 6); *see* Calvin M. Langton et al., *Actuarial Assessment of Risk for Reoffense Among Adult Sex Offenders*, 34 Crim. J. & Behav. 37, 45, 53 (Jan. 2007) (in comparison of a half-dozen risk-assessment instruments, SORAG found to be the most

accurate predictor of serious sexual recidivism).[4]  Dr. Herner explains the "low risk" assessment by noting that Mr. Chambers "does not exhibit dynamic risk factors that increase his risk for recidivat[ing], such as alcohol or drug use, aggression, criminal attitude, lack of desire to interact socially, bad temper, or negative social influences."  (Herner Rept. at pp. 7-8.)

There is, in addition, Mr. Chambers' high level of education, which Dr. Herner includes among the "[p]ersonal resources that help prevent future risk...."  (Herner Rept. at pg. 8.)  There is much empirical support for this observation.  "Studies have shown that education is correlated with reduced criminal behavior," wrote a data analyst in the U.S. Office of Probation and Pretrial Services, and "the more educated a sex offender is, the less likely he or she is to have his or her supervision revoked."  James L. Johnson, "Sex Offenders on Federal Community Supervision: Factors that Influence Revocation," 70 *Federal Probation* 30, 31 (Admin. Off. of U.S. Cts., June 2006).[5]  Following a study of over 3000 federal cases involving post-conviction supervision, the analyst remarked that "the revocation rate decreased by more than half when sex offenders obtained a college degree," *id.* at 32, and the data showed that offenders with post-graduate degrees – Mr. Chambers'

---

[4]     http://cjb.sagepub.com/content/34/1/37.short.

[5]     http://www.uscourts.gov/file/3502/download.

classification – had the lowest revocation rate of all (13.75%, compared to an overall average of 42.9%).  *See id.* at 45.

Dr. Herner also cites Mr. Chambers' family support as a factor auguring in favor of a crime-free life after release.  (Herner Rept. at pg. 8.)  The family's continued presence in Mr. Chambers' life is evident in their heartfelt letters to the Court.  (Attach. 2, Letters at pp. 1, 14-15, 23, 31-32.)  Mr. Chambers' wife, Debra, expresses her hope that he can someday "be reunited with his family who still loves him" (*id.* at pg. 15); "[w]e want nothing more than the chance to have him come home and see his grandchildren," writes his son-in-law.  (*Id.* at pg. 23.)  Mr. Chambers' "wife and children continue to love and support him with every ounce of their being," attests another family member.  (*Id.* at pg. 27.)

A similar commitment is voiced by the many friends whose letters of support express great loyalty and affection.  Mr. Chambers' former pastor expresses the hope that Mr. Chambers can have "some semblance and modicum of time in the remaining years of his life with his wife and family and friends…."  (*Id.* at pg. 3.)  Mr. Chambers has a "family and a group of friends who care for him, who support him now, and who will support him in the future," writes a 30-year friend.  (*Id.* at pg. 2.)  "[W]ith that support and his faith," adds another friend, "he has potential to redirect his life…."  (*Id.* at pg. 25.)

6

Mr. Chambers' friends do not pretend to understand, let alone excuse, the evil acts that require his imprisonment. They have known him only to be "positive and supportive" (Letters at pg. 7), a man who took time to "visit the sick at the hospitals and nursing homes" (*id.* at pg. 9), "a great personal friend and a mentor." (*Id.* at pg. 13.) These good qualities do not offset Mr. Chambers' crime; they do, however, explain why he still has so many friends and family who are willing to stand beside him at this moment of extremity, and why he can count on having a support network waiting for him when he finally emerges from prison.

The backing of family and friends is instrumental to an offender's ability to avoid new crimes. *See* Candace Kruttschnitt et al., "Predictors of Desistance Among Sex Offenders," 17 Justice Q. 61, 63-64 (Mar. 2000).[6] It is in this context that the tributes from Mr. Chambers' family and friends assume important legal substance: the existence of a strong network of devoted supporters makes recidivism less likely, and therefore favors a shorter prison term for Mr. Chambers. *See United States v. Stall*, 581 F.3d 276, 289 (6th Cir. 2009).

---

[6] https://www.researchgate.net/publication/248967423_Predictors_of_desistance_among_sex_offenders_The_interaction_of_formal_and_informal_social_controls.

Advanced age; a demonstrably low actuarial risk of recidivism; extensive education; and, maybe most important, the ongoing commitment of family and friends: taken together, they very nearly exclude any chance that Mr. Chambers will ever commit another crime, even if he is allowed to leave confinement after fifteen years rather than thirty or more. Fifteen years, then, is "sufficient, but not greater than necessary," to satisfy the need for incapacitation in this case.

### 2.  Rehabilitation

Yet another factor pointing to a low risk of recidivism – perhaps more important than any yet mentioned – is Mr. Chambers' receptiveness to psychological therapy, and particularly to sex offender treatment, as a central component of his efforts to return to society. Such counseling is vital to Mr. Chambers' ability to "exercise better decision-making and impulse control," writes Dr. Herner, and "skills obtained through treatment will help him redirect his energies and actions in a healthy controlled manner, thus continuing to diminish his risk to reoffend." (Herner Rept. at pg. 8.) Fortunately, given the imperative need for such counseling, Mr. Chambers "acknowledges that he needs help and has the motivation to actively work on his addiction." (*Ibid.*) It is accordingly possible for Dr. Herner to predict a successful course of rehabilitation for Mr. Chambers: "Sex offender treatment is

8

effective, particularly for motivated individuals such as Mr. Chambers." (*Ibid.*)

Fifteen years in prison more than a sufficient amount of time for Mr. Chambers to achieve the maximum benefit of the sex offender counseling available to those confined in federal prison. Under prevailing rules, in fact, the longer a sex offender's term of imprisonment, the longer he must wait before he can begin the course of treatment. The Bureau of Prisons' non-residential sex offender treatment program, currently available at nine institutions, does not evaluate an inmate for admission until the applicant has three years left on his sentence. U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Stmt. 5324.10 § 3.3.1(e) (Feb. 15, 2013).[7] The curriculum – 144 hours of treatment in a nine- to twelve-month period – is designed to play out over the last two years of the inmate's sentence. *Id.*, § 3.4.4.

Under the best of circumstances, then, Mr. Chambers will have to wait more than a decade before becoming eligible for the Bureau of Prisons' treatment program. Extending his punishment will merely lengthen his wait. Nothing of rehabilitative value can be gained by prolonging his sentence beyond the mandatory fifteen years.

---

[7] https://www.bop.gov/policy/progstat/5324_010.pdf.

### 3. Deterrence

Mr. Chambers' punishment must "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and this mandate obliges the Court "to look beyond the offender to the sentence's presumed effect on others," *United States v. Foss*, 501 F.2d 522, 527-528 (1st Cir. 1974), and thus to craft a punishment that gives "public warning [that] the consequences of the law will be severe when transgressed…." *United States v. Myers*, 353 F.Supp.2d 1026, 1028-1029 (S.D. Iowa 2005). In this sense, the Court must make an example of Mr. Chambers and punish him, not for his own sake, but for the edification of the community. This is perhaps the chief social utility of criminal punishment, and it is wholly appropriate for the Court to employ Mr. Chambers' sentence as a device to warn others not to commit Mr. Chambers' crimes.

There is, however, a limit beyond which the goal of deterrence cannot justify a defendant's punishment. "Central to our system of values and implicit in the requirement of individualized sentencing is the categorical imperative that no person may be used merely as an instrument of social policy," explained a Ninth Circuit opinion. *United States v. Barker*, 771 F.2d 1362, 1368 (9th Cir. 1985). "[H]uman beings are to be treated not simply as means to a social end like deterrence," continued the court, "but also – and always – as ends in

themselves." *Id.* As another opinion put it, "the weight of society's need to send a message to potential wrongdoers can only be borne to a limited extent by one individual." *Myers*, 353 F.Supp.2d at 1029 n.1.

The minimum punishment for Mr. Chambers is, by any measure, a long prison term. Fifteen years in a federal penitentiary is on the order of a sentence appropriate for robbing a bank and causing a victim's death or serious injury, *see* 18 U.S.C. § 2113(d), (e), *and* U.S.S.G. § 2B3.1, or for providing weapons to a foreign terrorist organization, *see* 18 U.S.C. § 2339B(a)(1) *and* U.S.S.G. § 2M5.3. Though the relationship between sentence length and general deterrent effect is not readily measured, it seems beyond doubt that a fifteen-year sentence for Mr. Chambers will make a substantial impression on anyone considering a similar crime.

Moreover, a prison term longer than fifteen years will not have a proportionally greater deterrent effect than the mandatory minimum punishment. Growing evidence demonstrates that increasing the severity of punishment does not produce a corresponding gain in deterrence. As one researcher observed, "studies have failed to establish the validity of marginal deterrence: the claim that there is a link between higher penalties and the crime rate." Mirko Bagaric, "Consistency and Fairness in

11

Sentencing," 2 Cal. Crim. L. Rev. 1 (July 2000) at ¶ 35.[8] Another scholar writes that "[c]riminological research over several decades and in various nations" supports the general conclusion that "enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment," whereas "[e]xisting evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms." Valerie Wright, "Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment" at pp. 4, 9, The Sentencing Project (Nov. 2010).[9] A researcher summarized the evidence this way: "[L]ong prison terms are likely to be more impressive to lawmakers than lawbreakers." Morgan O. Reynolds, "Does Punishment Deter," Policy Backgrounder No.148 at p.5, National Center for Policy Analysis (August 17, 1998).[10]

Deterrence justifies punishment because deterrence is socially useful; by the same token, the value of deterrence as a goal of sentencing wanes as its usefulness diminishes. Consider, in this context, the increasingly high financial cost of confining a man

---

[8] http://www.boalt.org/bjcl/v2/v2bagaric.pdf.

[9] http://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/.

[10] http://www.ncpa.org/pub/bg148.

of Mr. Chambers' age.  Mr. Chambers is already a member of "the most expensive subset of prisoners" in the federal system: older men whose healthcare costs must be borne by the Bureau of Prisons. Brie A. Williams, MD et al., *Addressing the Aging Crisis in U.S. Criminal Justice Healthcare*, pg. 3, J. Am. Geriatric Soc. (2012).[11]  Per capita healthcare costs for older prisoners have been measured at 3.5 times greater than those for younger prisoners, *id.* at pg. 3, and the DOJ Inspector General's study found that medical spending at prisons with a large elderly population is more than five times greater than the level spent in prisons with a predominantly young population.  *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* at pg. 12.[12]  As long ago as 2004, a Department of Justice report put the "annual cost of incarcerating this population" at "an average of $60,000 to $70,000 for each elderly inmate…." Nat'l Inst. of Corrections, U.S. Dep't of Justice, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* at pg. 11

---

[11]   NIH Public Access, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3374923/pdf/nihms363409.pdf at pg. 3.

[12]   https://oig.justice.gov/reports/2015/e1505.pdf; *see also* Am. Civ. Liberties Union, *At America's Expense: The Mass Incarceration of the Elderly* at pg. 28 (2012) ("Most states estimate that healthcare for an elderly prisoner costs roughly two to three times that for a younger prisoner"), available online at https://www.aclu.org/files/assets/elderlyprisonreport_20120613_1.pdf.

(2004).[13] (Adjusted for inflation, that average cost would now range between $77,000 and $89,000 for each elderly inmate. *See* http://www.saving.org/inflation/ (inflation calculator).) Every year added to Mr. Chambers' mandatory minimum fifteen will likely be an increasingly expensive year for taxpayers, and the marginal deterrent value (if any) purchased by that extra year will not justify the steep cost.

Fifteen years in prison will have a deterrent effect. More than fifteen years will not have a correspondingly greater deterrent effect, but will come at a correspondingly greater cost to taxpayers. For purposes of deterrence, then, the mandatory minimum term is "sufficient, but not greater than necessary," in this case.

### 4. Retribution

"It is Congress's prerogative to dictate sentencing enhancements based on a retributive judgment that certain crimes are reprehensible and warrant serious punishment as a result...." *United States v. Bistline*, 720 F.3d 631, 633 (6th Cir. 2013). Retribution – the goal of "provid[ing] just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A) – can therefore justify a long sentence, even if the extended duration of imprisonment serves no

---

[13] https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf.

other purpose.  *See United States v. Rausch*, 570 F.Supp.2d 1295, 1303-1304 (D.Col. 2008).

If the Court agrees with the proposition that a fifteen year prison term is "sufficient, but not greater than necessary," to satisfy the first three goals of punishment – incapacitation, rehabilitation, and deterrence – then the question is whether *retribution alone* calls for a sentence longer than fifteen years.  In other words, does the interest of "imposing merited harm upon the criminal for his wrong" demand more than fifteen years in prison, "even when social benefit will not be achieved" by lengthening the punishment?  *See* Michele Cotton, *Back with a Vengeance: The Resilience of Retribution as an Articulated Purpose of Criminal Punishment*, 37 Am. Crim. L. Rev. 1313, 1315-16 (Fall 2000).  More simply, does the cause of "vengeance for its own sake" demand a punishment longer than fifteen years, even if the additional years in prison do not "affect future conduct or solve any problem" other than satisfy the desire to achieve justice?  *See Artway v. Attorney Gen.*, 81 F.3d 1235, 1255 (3rd Cir. 1996).

It may be useful in this context to recall that when Congress originally drafted 18 U.S.C. § 1591(b)(1), the statute did not contain a fifteen year minimum punishment; rather, an offender could be sentenced to "imprisonment for any term of years or for life…."  *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386 § 112(a)(2), 114 Stat. 1464.  At its

15

inception, in other words, the statute embodied a legislative view that none of the objectives of punishment, including retribution, called for a mandatory minimum prison term of any length. This, in turn, gave the U.S. Sentencing Commission the widest possible latitude to calculate a prison term that fit the Sentencing Guidelines' goal of "proportionality," defined as a punishment appropriate for the severity of the criminal conduct outlawed by the statute. *See* U.S.S.G. Chap. 1, Pt. A, § 1.3 ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."). The Sentencing Commission responded in 2004 with a new guideline, § 2G1.3, which prescribed a base offense level of 24 for crimes involving a commercial sex act with a minor. U.S. Sentencing Guidelines Manual app. C, Amdt. 644 (2004). As applied to Mr. Chambers' circumstances, the guideline would have called for a punishment of 70 to 87 months, about one-third the length of the present-day mandatory minimum:

|  |  |  | 2004 |  |
|---|---|---|---|---|
| 2G1.3(a)(1) | Base offense level | | 24 | |
| 2G1.3(b)(2)(B) | Defendant unduly influenced a minor | | 2 | |
| 2G1.3(b)(3) | Use of a computer | | 2 | |
| 2G1.3(b)(4) | Offense involved the commission of a sex act | | 2 | |
| 4B1.5(b)(1) | Repeat sex offender | | 0 | A violation of 18 U.S.C. § 1591 did not become a "covered sex crime" until 2007 |
| | | **Subtotal:** | **30** | **97-121 months** |
| 3E1.1 | Acceptance of responsibility | | - 3 | |
| | | **Total:** | **27** | **70-87 months** |

*Ibid.* and app. C, Amdt. 615 (2001) (contemporary version of § 4B1.5).

Six years after § 1591's enactment, Congress inserted the fifteen-year minimum. Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248 § 208, 120 Stat. 587, 615. The legislators did not specify their reasons for increasing the minimum punishment; the amendment came too soon after § 1591's creation for social scientists to have accumulated empirical evidence that the original punishment was too light to meet the needs of incapacitation, rehabilitation, or deterrence. In any case, Congress's modification of the penalty dictated a corresponding revision to the applicable sentencing guideline,

17

resulting in a much-increased base offense level and producing the guideline range that prevails today:

|  |  | 2004 |  | 2016 |  |
|---|---|---|---|---|---|
| 2G1.3(a)(1) | Base offense level | 24 |  | 34 |  |
| 2G1.3(b)(2)(B) | Defendant unduly influenced a minor | 2 |  | 2 |  |
| 2G1.3(b)(3) | Use of a computer | 2 |  | 2 |  |
| 2G1.3(b)(4) | Offense involved the commission of a sex act | 2 |  | 2 |  |
| 4B1.5(b)(1) | Repeat sex offender | 0 |  | 5 |  |
|  | **Subtotal:** | 30 | 97-121 months | 45 | Life |
| 3E1.1 | Acceptance of responsibility | - 3 |  | -3 |  |
|  | **Total:** | 27 | 70-87 months | 42 | 360-life |

*See* U.S. Sentencing Guidelines Manual app. C, Amdt. 701 (2007) (amending §§ 2G1.3(a)(1) and 4B1.5 app. n. 2).

It is impossible, perhaps, to gauge objectively and adjust precisely the amount of vengeance that Mr. Chambers rightly deserves. Congress and the Sentencing Commission once would have put that figure at about six or seven years in prison; at present, Congress has instructed the Court that society's need for retribution, if nothing else, mandates a sentence of at least fifteen years in prison. Mr. Chambers' punishment need not be longer than that – a fifteen-year term is severe enough to satisfy the goal of retribution, and anything more would be greater than necessary in this case.

\* \* \* \* \*

"Please know that all I want for the rest of my life is to see my father alive outside of prison walls," writes Mr. Chambers' daughter Erin.  (Letters at pg. 1.)  "I need him in my life like I need air to breathe," she says, and she expresses the hope that her children will someday have the chance to "know who their grandfather is…."  (*Ibid.*)  "I humbly ask you for the minimum sentence," she concludes.  (*Ibid.*)

The Court can, and for a multitude of good reasons should, grant this request.  The statute's fifteen year minimum punishment is fully sufficient to meet all of the objectives of sentencing; nothing more can be accomplished, nor any outcome improved upon, by lengthening this punishment.  The defense accordingly urges the Court to impose a fifteen year sentence.

Respectfully submitted,

*s/ Michael R. Mazzoli*
Scott C. Cox
Michael R. Mazzoli
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
fax: 584-1744
e-mail: MazzoliCMLaw@aol.com

*s/ Rob Eggert*

J. Rob Eggert
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
fax: 584-1744
e-mail: TLyons@600MainLaw.com

## CERTIFICATE OF SERVICE

On August 30, 2016, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*

Michael R. Mazzoli